1

2

3

4

5

6

7                            IN THE UNITED STATES DISTRICT COURT

8                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   TINA HOPSON, individually and on behalf of          No. CV-08-0844 EDL
     all others similarly situated,
11                                                        **ORDER GRANTING FINAL APPROVAL
                         Plaintiffs,                      OF CLASS ACTION SETTLEMENT AND
12                                                        GRANTING PLAINTIFF'S MOTION
         v.                                               FOR ATTORNEYS' FEES**
13
     HANESBRANDS INC.; SARA LEE
14   CORPORATION and DOES 1 through 50,
     inclusive
15
                         Defendants.
16   _____/

17

18           Plaintiff Tina Hopson brought this putative class action lawsuit against Defendants

19   Hanesbrands, Inc. and Sara Lee Corporation alleging that Defendants misclassified Plaintiff and

20   other Hanesbrands Service Representatives as exempt under federal and state wage-and-hour laws,

21   thus not paying proper overtime wages, and failed to comply with California labor laws such as

22   providing meal and rest periods for California employees.  Defendants maintain that Plaintiff and the

23   proposed Class were properly classified.  On April 8, 2008, the parties engaged in negotiations,

24   represented by counsel, and agreed to settle this action and all other matters covered by the June 16,

25   2008 proposed settlement, as corrected in the July 30, 2008 stipulation.  On August 8, 2008, the

26   Court preliminarily approved the parties' settlement, and ordered that Class Notices be sent by the

27   Settlement Administrator, Rust Consulting, Inc., to the potential Class Members.

28           Now before the Court is the parties' Joint Motion for Final Approval of Class Action

     Settlement and Plaintiff's Motion for Attorneys' Fees.  The Court held a hearing on these motions

     on March 10, 2009.  For the reasons stated at the hearing and in this order, the Joint Motion for Final

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    Approval and Plaintiff's Motion for Attorneys' Fees are granted.

2    **The Settlement Class**

3         The Class consists of: (i) all persons who worked as full-time Service Associates for

4    Defendants anywhere in the United States other than the State of California at any time from (a)

5    May 22, 2001, to September 1, 2007, if the person worked in the State of New York or the

6    Commonwealth of Massachusetts; (b) May 22, 2002 to September 1, 2007, if the person worked in

7    the Commonwealth of Kentucky; (c) May 22, 2003 to September 1, 2007, if the person worked in

8    the State of Florida or the State of Texas; or (d) May 22, 2004 to September 1, 2007, if the person

9    worked in any state other than California; (ii) all persons who worked as full-time Service

10   Associates for Defendants in the State of California at any time during the period from May 22,

11   2004 to September 1, 2007; and (iii) all persons who worked as part-time Service Associates for

12   defendants in the State of California at any time during the period from May 22, 2004 to September

13   1, 2007.   See Declaration of Anne Nergaard Ex. 1 at § 1.C; Stip. to Correction of Settlement

14   Agreement (docket # 22).

15   **The Settlement Amount**

16        The Settlement provides that Defendants will pay a Maximum Settlement Amount of

17   $408,420.32, which represents approximately 39% of the maximum potential recovery of damages

18   and penalties by the Class of $1,026,000.00 (but without taking into account any statutory award of

19   attorneys' fees).  See Joint Supp. Brief in Support of Joint Mot. for Prel. Approval of Class Action

20   Settlement at II; Stipulation and Order re: Discovery of New Class Members, Postponement of Final

21   Approval Hearing at ¶ 5.  The Settlement Agreement provides that the following amounts are

22   deducted from the Maximum Settlement Amount:  (1) Class Representative Payment of $5,000; (2)

23   attorney's fees of $102,105.08 and costs of $7,658.86; (3) payment of $1,500 to the California Labor

24   and Workforce Development Agency; and (4) Settlement Administrator's fees of $11,807.00.  The

25   Net Settlement Amount is approximately $280,350.00.

26        The Net Settlement Amount will be distributed to claimants based on the number of work

27   weeks during the class period compared to the total work weeks for the Settlement Class as a whole.

28   See Nergaard Decl. Ex. 1 at §§ I.B, III.A.2.  Full-time Class Members employed in California will

2

1   have their work weeks increased by a factor of 1.5 to compensate for the additional remedies

2   available under California law to misclassified employees compared to the remedies available under

3   the FLSA to misclassified employees.  See id. § III.B.1.  Part-time Class Members will have their

4   work weeks decreased by a factor of 0.5 to account for: (i) the fewer hours on average they worked

5   compared to the hours that full-time Class Members on average worked; and (ii) the fact that while

6   they worked for defendants, they were paid on an hourly basis and were paid overtime compensation

7   for overtime hours worked.  See id. § III.B.2.

8   **Discussion**

9        Final approval of a case where settlement is reached prior to class certification requires two

10  inquiries.  First, the district court must assess whether a class exists.  See Amchem Prods., Inc. v.

11  Windsor, 521 U.S. 591, 620 (1997) ("But other specifications of [Rule 23] -- those designed to

12  protect absentees by blocking unwarranted or overbroad class definitions -- demand undiluted, even

13  heightened attention in the settlement context.  Such attention is of vital importance, for a court

14  asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust

15  the class, informed by the proceedings as they unfold.").  Second, the district court must consider

16  whether a proposed settlement is "fair, reasonable and adequate."  See Hanlon v. Chrysler Corp.,

17  150 F.3d 1011, 1026 (9th Cir. 1998) (recognizing that "[i]t is the settlement taken as a whole, rather

18  than the individual component parts, that must be examined for overall fairness. . . .").

19  **1.     Class certification**

20       Class certification requires that: (1) the class be so numerous that joinder of all members

21  individually is 'impracticable;' (2) there are questions of law or fact common to the class; (3) the

22  claims or defenses of the class representative must be typical of the claims or defenses of the class;

23  and (4) the person representing the class must be able fairly and adequately to protect the interests of

24  all members of the class.  See Fed. R. Civ. P. 23(a); Staton v. Boeing, 327 F.3d 938, 953 (9th Cir.

25  2003).  In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class

26  certification must also show that the action is maintainable under Federal Rule of Civil Procedure

27  23(b).  Here, the parties assert that the action is maintainable under Rule 23(b)(3) because questions

28  of law or fact common to Class Members predominate over any question affecting only individual

members, and a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy.  Fed. R. Civ. P. 23(b); Hanlon v. Chrysler, 150 F.3d 1011, 1022 (9th

Cir. 1998).

 **A.**  **Rule 23(a)**

   **i.**  **Numerosity**

   The class must be so numerous that joinder of all members individually is "impracticable."

See Fed. R. Civ. P. 23(a)(1).  When evaluating numerosity, courts should consider the number of

class members, whether their identities are known, the geographical diversity of class members, the

ability of individual claimants to institute separate suits, and whether injunctive relief is sought.  See

William Schwarzer, Federal Civil Procedure Before Trial, §§ 10:260-10:264 (Rutter Group).

Numerosity is generally found when a class comprises forty or more members, and not if the class

comprises twenty-one or fewer members.  See Consolidated Rail Corp. v. Town of Hyde Park, 47

F.3d 473, 483 (2d Cir.1995); Ansari v. New York Univ., 179 F.R.D. 112, 114 (S.D.N.Y.1998); see

also Wamboldt v. Safety-Kleen Sys., Inc., 2007 WL 2409200, *11 (N.D. Cal. Aug. 21, 2007).

   Here, the potential number of Class Members (217) as well as the actual number of Class

Members who have responded (176) satisfies the numerosity element.  The identities of the Class

Members are known to the parties here and they have already made claims.  The Class is

geographically diverse, comprising employees from across the country.  Further, the recovery in this

case on an individual level would be low, thereby making individual claims less likely.  Specifically,

the parties agree that full-time Class Members' yearly average wages were just over $33,000 and

that the number of overtime hours worked during the class periods was at most less than one hour of

overtime per week.

   **ii.**  **Commonality**

   Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  The

Ninth Circuit stated:

> Rule 23(a)(2) has been construed permissively.  All questions of fact and law need
> not be common to satisfy the rule.  The existence of shared legal issues with
> divergent factual predicates is sufficient, as is a common core of salient facts coupled
> with disparate legal remedies within the class.

*United States District Court*
*For the Northern District of California*

4

1   Hanlon, 150 F.3d at 1019; see also Staton v. Boeing, 327 F.3d 938, 953 (9th Cir. 2003).

2         Here, all Class Members were employed in the same job, Service Associate.  With respect to

3   the full-time Class Members who had common duties and whose claims include overtime wages,

4   issues of law and fact are common to the Class.  Similarly, the facts and law are common to the

5   California Class Members, who have additional claims for violations of California Labor Code

6   provisions regarding meal and rest periods and wages.

7              **iii.    Typicality**

8         Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of

9   the claims or defenses of the class."  "Under the rule's permissive standards, representative claims

10   are 'typical' if they are reasonably coextensive with those of absent class members; they need not be

11   substantially identical."  Hanlon, 150 F.3d at 1020; see also Staton, 327 F.3d at 957.  Further, the

12   claims of the purported class representative need not be identical to the claims of other class

13   members, but the class representative "must be part of the class and possess the same interest and

14   suffer the same injury as the class members."  General Tel. Co. of Southwest v. Falcon, 457 U.S.

15   147, 156 (1982).  That injuries may differ in amount does not defeat typicality.  See Schwarzer,

16   Federal Civil Procedure Before Trial, § 10:293.

17         Here, Plaintiff's claims are coextensive with those of other Class Members in that each

18   nationwide Class Member seeks relief for unpaid overtime under the Fair Labor Standards Act, and

19   the California Class Members seek additional relief under California Labor Law.  Defendants'

20   defenses to Plaintiff's claims are typical of Defendants' defenses to Class Members' claims.  The

21   typicality requirement is met because the legal theories pursued by the named Plaintiff are identical

22   to those of the absent Class Members, and they suffered the same type of injury (e.g., denial of

23   overtime pay), even though the amount of damages suffered are not exactly identical.

24              **iv.    Adequacy of Representation**

25         Rule 23(a)(4) permits the certification of a class action only if "the representative parties will

26   fairly and adequately protect the interests of the class."  Representation is adequate if: (1) the class

27   representative and counsel do not have any conflicts of interest with other class members; and (2)

28   the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class.

**United States District Court**
For the Northern District of California

1  <u>Staton</u>, 327 F.3d at 957.

2       Here, it does not appear that there are any conflicts between Ms. Hopson, the named

3  representative, and her counsel, and the other Class Members.  Ms. Hopson has been a strong

4  advocate for the Class.  <u>See, e.g.,</u> Declaration of Tina Hopson ¶ 4.  Therefore, the adequacy of

5  representation element has been satisfied.

6       **B.     Rule 23(b)(3)**

7       Rule 23(b)(3) states:

8       A class action may be maintained if Rule 23(a) is satisfied and if:  . . . (3) the court
         finds that the questions of law or fact common to class members predominate over
9        any questions affecting only individual members, and that a class action is superior to
         other available methods for fairly and efficiently adjudicating the controversy. The
10       matters pertinent to these findings include: (A) the class members' interests in
         individually controlling the prosecution or defense of separate actions;  (B) the extent
11       and nature of any litigation concerning the controversy already begun by or against
         class members; (C) the desirability or undesirability of concentrating the litigation of
12       the claims in the particular forum; and (D) the likely difficulties in managing a class
         action.
13

14  Certification under Rule 23(b)(3) is appropriate "whenever the actual interests of the parties can be

15  served best by settling their differences in a single action."  <u>Hanlon</u>, 150 F.3d at 1022 (quoting 7A

16  Wright & Miller, <u>Federal Practice and Procedure</u>, § 1777 (2d ed. 1986)).

17       The test for predominance is "whether proposed classes are sufficiently cohesive to warrant

18  adjudication by representation."  <u>Hanlon</u>, 150 F.3d at 1022 (quoting <u>Amchem</u>, 117 S. Ct. at 2249).

19  In contrast to the commonality requirement of Rule 23(a), Rule 23(b)(3) "focuses on the relationship

20  between the common and individual issues."  <u>Hanlon</u>, 150 F.3d at 1022.  Specifically, "when

21  common questions present a significant aspect of the case and they can be resolved for all members

22  of the class in a single adjudication, there is clear justification for handling the dispute on a

23  representative rather than on an individual basis."  <u>Hanlon</u>, 150 F.3d at 1022 (quoting Wright &

24  Miller, § 1778).  Here, because all Class Members seek recovery under the same federal and state

25  laws, common questions of liability predominate.

26       The test for superiority of the class action vehicle requires "determination of whether the

27  objectives of the particular class action procedure will be achieved in the particular case," which

28  "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution."

United States District Court
For the Northern District of California

1   Hanlon, 150 F.3d at 1023 (citing Wright & Miller, § 1779).  Here, as in Hanlon, the alternative

2   mechanism would be individual claims for small amounts of damages.  Not only would this

3   mechanism burden the court system that would be deciding the same legal issues in a number of

4   small cases, but it would also make little economic sense for litigants or lawyers.  See Hanlon, 150

5   F.3d at 1023 (noting possibility that in individual cases, "litigation costs would dwarf potential

6   recovery"); see also Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1154, 1163

7   (9th Cir. 2001) ("If plaintiffs cannot proceed as a class, some – perhaps most – will be unable to

8   proceed as individuals because of the disparity between their litigation costs and what they hope to

9   recover.").  The fact that fourteen Class Members (less than 7% of the total) have opted out of this

10  Class does not demonstrate that individual actions are a more appropriate method for prosecuting

11  this case.  Therefore, in this case, a class action is the superior mechanism.

12       Accordingly, the Court concludes that this Class should be certified pursuant to Federal

13  Rules of Civil Procedure 23(a) and 23(b)(3).

14  **2.     Notice**

15       Rule 23(e) requires that adequate notice be provided to all class members.  Here, the notice

16  procedure satisfied Rule 23(e).

17       The court-approved Class Notice was provided through Rust Consulting, Inc. ("Rust"), a

18  company that has extensive experience in class action matters, having provided services in more

19  than 1,200 class action cases including over 450 labor and employment cases.  See Declaration of

20  Caryn Donly ¶ 2.  On August 22, 2008, Defendants' counsel gave Rust a mailing list for 209 Class

21  Members.  See id. ¶ 5.  Before the Notice Packets were mailed, Rust verified and updated the Class

22  Members' addresses by using the National Change of Address Database maintained by the U.S.

23  Postal Service.  See id. ¶ 8.  Rust obtained a mailing address to receive Claim Forms, Exclusion

24  Forms and undeliverable mail.  See id. ¶ 9.  Rust also established a toll free number for the purpose

25  of providing information to the Class Members.  See id.

26       On September 5, 2008, Rust mailed the Notice Packet via first-class mail to the 209 Class

27  Members.  See id. ¶ 6.  After the Notice Packets were mailed, two individuals inadvertently omitted

28  from the list identified themselves, and on November 24, 2008, Defendants' counsel provided Rust

1   with a supplemental mailing list containing the names of eight additional Class Members who had

2   been inadvertently excluded from the original list.  See id. ¶ 7.  On December 10, 2008, Rust sent

3   out Notice Packets to the additional eight Class Members, for a total of 217 potential Class

4   Members.  See id. ¶ 10.

5          Rust has received five undeliverable Notice Packets returned in the mail.  See id. ¶ 11.  Rust

6   performed address traces on all undeliverable Notice Packets and was able to obtain updated mailing

7   information for all five.  See id.  Five new Notice Packets were mailed, and only one was returned a

8   second time.  See id.  One Notice Packet was returned with a forwarding address, and Rust re-mailed

9   the Notice Packet to that forwarding address.  See id. ¶ 12.  Rust has received twenty-nine calls on

10  its toll free number, fourteen of which were seeking re-mailings of the Notice Packet, which was

11  promptly done.  See id. ¶ 13.

12         Rust received 177 Claim Forms, including four untimely claims that the parties agreed to

13  honor, which represents 81.57% of the total Class.  See Donly Decl. ¶ 14; Supp. Declaration of

14  Caryn Donly ¶¶ 6-8.  Four Class Members disputed their employment history as shown on the Claim

15  Form.  See Donly Decl. ¶ 15; Supp. Donly Decl. ¶ 3.  Three of the four Class Members did not

16  provide any documentation supporting their disputes, and after Defendants rechecked their records

17  and confirmed the accuracy of the Claim Forms, these three disputes were deemed not valid.  See

18  Supp. Donly Decl. ¶ 4.  Defendants determined that the number of work weeks for the fourth Class

19  Member was misstated, and therefore the dispute was determined to be valid and Rust credited the

20  Class Member with additional work weeks.  See Supp. Donly Decl. ¶ 5.  Rust determined that one

21  Claim Form was deficient, but the deficiency was resolved.  See Donly Decl. ¶ 16.  Fourteen Class

22  Members, or 6.45% of the total Class, have opted out.  See id. ¶ 17.  No Class Members objected to

23  the settlement.  See id. ¶ 18.

24         Further, the parties gave notice of the Settlement to the Attorney General of the United States

25  and the appropriate state officials of each state in which a Class Member resides.  See Supp. Decl. of

26  Compliance with the Class Action Fairness Act of 2005.  Therefore, the requirements of the Class

27  Action Fairness Act, 28 U.S.C. § 1715, have been satisfied.

28

**United States District Court**
For the Northern District of California

### 3.    Fairness of Settlement

"Fed. R. Civ. P. 23(e) requires the district court to determine whether a proposed settlement is fundamentally fair, adequate and reasonable." <u>Hanlon</u>, 150 F.3d at 1026.  To determine whether a settlement agreement meets this standard, a district court must consider a number of factors, including:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

<u>Hanlon</u>, 150 F.3d at 1027; <u>see also</u> <u>Staton</u>, 327 F.3d at 959.  Settlement approval that takes place prior to formal class certification requires a higher standard of fairness: "The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court-designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)." <u>Hanlon</u>, 150 F.3d at 1026. District court review of class action settlements "includes not only consideration of whether there was *actual* fraud, overreaching or collusion but, as well, substantive consideration of whether the terms of the decree are 'fair, reasonable and adequate to all concerned.'" <u>Staton</u>, 327 F.3d at 960 (quoting <u>Officers for Justice v. CCSF</u>, 688 F.2d 615, 625 (9th Cir. 1982)).  The appellate court will rarely overturn approval of a class action settlement unless "the terms of the agreement contain convincing indications that the incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of the negotiations and that the district court was wrong in concluding otherwise." <u>Staton</u>, 327 F.3d at 960.  In <u>Staton</u>, therefore, the court focused on whether the aspects of the settlement that lend themselves to pursuit of self-interest, namely attorneys' fees and distribution of monetary relief among class members, "strictly comported with substantive and procedural standards designed to protect the interests of the class members." <u>Staton</u>, 327 F.3d at 960.

Here, the parties argue that they reached a non-collusive settlement after receiving sufficient discovery to enable counsel to make educated decisions about the strengths and weaknesses of this case.  See, e.g., <u>Linney v. Cellular Alaska P'ship</u>, 1997 WL 450064, at *5 (N.D. Cal. Jul. 18, 1997)

1  ("The involvement of experienced class action counsel and the fact that the settlement agreement

2  was reached in arm's length negotiations, after relevant discovery had taken place create a

3  presumption that the agreement is fair.").  The parties state that because obtaining class certification,

4  overcoming Defendants' defenses and establishing liability posed difficult hurdles for the Class that

5  justified compromise of their claims, the settlement agreement is within the range of reasonable

6  outcomes.

7       As described in the Court's August 8, 2008 Order, the <u>Hanlon</u> factors weigh in favor of

8  finding that the Settlement Agreement is fair.  First, Plaintiffs may have a strong case, but the risks

9  inherent in continued litigation are great.  Defendants strongly deny liability for Plaintiffs' principal

10  claim that full-time Service Associates were misclassified as exempt.  In addition to the uncertainties

11  raised by Defendants at the preliminary stage regarding Plaintiffs' chance of success in this case,

12  Defendants notes that the question of an employer's duty to provide rest and meal periods is an open

13  one, signaling even less certainty for Plaintiffs.  After preliminary approval of the settlement, the

14  California Supreme Court granted review of the question of whether the duty to "provide"

15  employees with meal and rest breaks means only to make those breaks available, or rather to ensure

16  that employees take those breaks regardless of their personal preferences.  <u>See</u> <u>Brinker Rest. Corp. v.</u>

17  <u>Superior Court</u>, 165 Cal.App.4th 25 (2008), <u>review granted and opinion superseded</u>, 85 Cal. Rptr. 3d

18  688 (Oct. 22, 2008).  Defendant argues that Plaintiff and the Class Members had the opportunity to

19  take meal and rest periods because they structured their own schedules (<u>see</u> Declaration of Kathy

20  Gugino in Support of Joint Mot. for Prel. Approval of Class Action Settlement ¶ 4), so the Supreme

21  Court's decision in <u>Brinker</u> may well impact this case.

22       Second, as described in the Court's August 8, 2008 Order, the gross settlement amount and

23  the Class Members' expected net recovery, after fees and other costs are deducted, appear to be a

24  reasonable compromise, in light of the risks of litigation.  Class Members are estimated to receive an

25  average of $1,568.44 each.  The gross settlement amount represents 39% of the maximum expected

26  recovery of lost wages and penalties should Plaintiffs prevail.  <u>See</u> Joint Supp. Brief in Support of

27  Mot. for Prel. Approval of Class Action Settlement at II.  If the gross settlement amount is reduced

28  by the amount of fees sought, it still represents approximately 30% of the maximum expected lost

10

**United States District Court**
For the Northern District of California

1    wages and penalties should Plaintiffs prevail.

2        The Court noted at the March 10, 2009 hearing, however, that the gross settlement amount

3    set forth by the parties did not include any provision for the statutory attorneys' fees that the Class

4    would be entitled to in addition to the lost wages and penalties recovered if the Class were to

5    prevail. See, e.g., Cal. Labor Code § 226; Staton, 327 F.3d at 972 ("In the course of judicial review,

6    the amount of such attorneys' fees can be approved if they meet the reasonableness standard when

7    measured against statutory fee principles. Alternatively, the parties may negotiate and agree to *the*

8    *value of a common fund (which will ordinarily include an amount representing an estimated*

9    *hypothetical award of statutory fees*) and provide that, subsequently, class counsel will apply to the

10   court for an award from the fund, using common fund fee principles.") (emphasis added).

11   According to the common fund approach set forth in Staton, conservatively adding only the fees

12   sought here of $102,105.08 to the total maximum expected recovery of wages and penalties raises

13   the total projected recovery to $1,128.105.00, of which the gross settlement amount represents 36%.

14   The potential fee recovery would, of course, increase if the case were litigated longer, reducing the

15   percentage somewhat further.  For example, including a relatively modest estimated potential

16   recovery of $300,000 in fees in the calculation would lower the percentage to 31%.  Nonetheless, all

17   of these calculations lead to the conclusion that the settlement amount falls within a reasonable

18   range.  See, e.g., In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000) (stating in

19   shareholder derivative action: "'It is well-settled law that a cash settlement amounting to only a

20   fraction of the potential recovery does not per se render the settlement inadequate or unfair.'"

21   [citation omitted]. Even assuming that Nadler's methodology was more sound, the Settlement

22   amount of almost $2 million was roughly one-sixth of the potential recovery, which, given the

23   difficulties in proving the case, is fair and adequate.") (quoting Officers for Justice v. CCSF, 688

24   F2d 615 (9th Cir. 1982)); Shlensky v. Dorsey, 574 F.2d 131, 147-48 (3d Cir. 1978) (stating in

25   shareholder derivative action: "This figure, which is approximately 15% of the maximum amount of

26   unlawfully disbursed corporate funds alleged to be involved in the suit, can hardly be said to provide

27   a grossly inadequate benefit to Gulf in view of the uncertainties of this litigation."); In re Cendant

28   Corp. Derivative Action Litig., 232 F. Supp. 2d 327, 336 (D. N.J. 2002) ("The settlement of $54

1    million represents less than two percent of that amount, a small percentage. This amount may be

2    justifiable, however, given the fact that the Settling Defendants appear to have significant defenses

3    that increase the risks of litigation.").

4         Third, as stated in the August 8, 2008 Order, "the parties engaged in informal discovery prior

5    to reaching a settlement, during which Defendants produced payroll records that informed the

6    parties' decision to settle." Aug. 8, 2008 Order at 5. Fourth, the plan for distributing the settlement

7    amount is reasonable and fair. The amount of Plaintiff's attorneys' fees and costs is fair, as

8    discussed below in detail in connection with Plaintiff's Motion for Attorneys' Fees. Further, the

9    other aspects of the settlement distribution are fair.

10        Under the California Private Attorneys General Act of 2004 ("PAGA"), California Labor

11   Code § 2698, et seq., the Labor Workforce and Development Agency ("LWDA") is entitled to 75%

12   of any settlement of civil penalties awardable under the Labor Code. See Cal. Labor Code. §

13   2699(i) ("Except as provided in subdivision (j), civil penalties recovered by aggrieved employees

14   shall be distributed as follows: 75 percent to the Labor and Workforce Development Agency for

15   enforcement of labor laws and education of employers and employees about their rights and

16   responsibilities under this code, to be continuously appropriated to supplement and not supplant the

17   funding to the agency for those purposes; and 25 percent to the aggrieved employees."). The parties

18   state that in this case, the crux of Plaintiff's complaint was the failure to pay overtime, and the

19   parties' settlement did not allocate sums among the categories of non-civil penalties and instead

20   negotiated a good faith amount of $1,500 for LWDA. This is a reasonable amount, and there is no

21   indication that this amount was the result of self-interest at the expense of other Class Members.

22        With respect to the costs of administration, the amount sought on behalf of Rust, $11,807.00,

23   or 3% of the total settlement amount, is reasonable. Ms. Donly explains in detail the activities

24   conducted by Rust, and Rust appears to have done a thorough job to date in administering this

25   settlement.

26        The parties propose that if the residual settlement amount (the amount of settlement checks

27   not cashed after 120 days) is more than $15,000, then that amount will be distributed to all claimants

28   on a pro rata basis according to the value of their settlement shares. If the amount is less than

United States District Court
For the Northern District of California

1    $15,000, the settlement administration fees that would be incurred in a second distribution to the

2    claimants would exceed the amount redistributed.  See Joint Supp. Brief in Support of Joint Mot. for

3    Prel. Approval of Class Action Settlement at IV.  Therefore, if the amount is less than $15,000, the

4    parties propose dividing the amount equally between the United Way of Forsyth County, North

5    Carolina, and the Marin County Family and Children's Law Center in San Rafael, California.

6    See Nergaard Decl. Ex. 1.  While the law generally favors distributing unclaimed funds for a

7    purpose as near as possible to the legitimate objectives underlying the lawsuit, a direct nexus

8    between the injured plaintiffs and the cy pres recipients is neither always feasible nor required.

9    Compare In re Airline Ticket Commission Antitrust Litigation, 307 F.3d 679, 680 (8th Cir. 2002)

10   (holding that the trial court had abused its discretion with respect to cy pres distribution because

11   there was no nexus between the injured class and the local organizations receiving unclaimed funds)

12   (citing Powell v. Georgia-Pacific Corporation, 119 F.3d 703, 706-07 (8th Cir. 1997) (approving the

13   district court's order that nearly $1 million in remainder settlement funds be distributed as

14   scholarships to African American high school students because the scholarship program carried out

15   the plaintiffs' desire and addressed the subject matter of the lawsuit: employment opportunities

16   available to African Americans in the region), with Superior Beverage Co. v. Owens-Ill., Inc. 827 F.

17   Supp. 477, 479 (N.D. Ill. 1993) (holding that unclaimed funds remaining after settlement of an

18   antitrust case may be distributed to other public interests not closely related to the origins of the

19   case).

20          Here, Defendants chose the United Way in Forsyth County because Defendants are

21   headquartered in Forsyth County and have worked with that United Way for ten years.  See

22   Declaration of Christopher Fox ¶¶ 2-3.  Defendants and their employees have donated

23   approximately $2 million per year to that organization.  See id. ¶ 3.  The Family and Childrens' Law

24   Center represents low- and middle-income clients, primarily women, with family law cases in Marin

25   County courts.  Plaintiff chose the Family and Childrens' Law Center because she filed this lawsuit

26   in Marin County and she was employed by Hanesbrand in Marin County, and because most of the

27   Class Members are women.  Although the nexus between the charities and the injured Class is

28   somewhat attenuated, the Court recognizes that the amounts that may be distributed would be so

                                                  13

1    small that expending any further effort over this contingency (which may not materialize) could lead

2    to incurring a disproportionate amount of attorneys' fees, without yielding any benefit to the Class,

3    and the parties have shown at least some connection between the Class Members and the charities.

4    Therefore, the Court concludes that the proposal for this very modest potential <u>cy pres</u> distribution is

5    fair.

6            Named plaintiffs are entitled to reasonable incentive payments, but the court must evaluate

7    the award individually to detect excessive payments reached through collusion.  <u>Staton</u>, 327 F.3d at

8    952.  To assess whether an incentive payment is excessive, district courts balance "the number of

9    named plaintiffs receiving incentive payments, the proportion of the payments relative to the

10   settlement amount, and the size of each payment."  <u>Staton</u>, 327 F.3d at 977.  In general, courts have

11   found that $5,000 incentive payments are reasonable.  <u>See, e.g.</u>, <u>In re Mego Fin. Corp. Sec. Litig.</u>,

12   213 F.3d 454, 463 (9th Cir., 2000) (approving incentive award of $5,000 to two plaintiff

13   representatives of 5,400 potential class members in $1.75 million settlement, but constituting only

14   0.56% of the settlement); <u>In re SmithKline Beckman Corp.</u>, 751 F. Supp. 525, 535 (E.D. Pa. 1990)

15   (approving incentive payments of $5,000 for one named representative of each of nine plaintiff

16   classes involving more than 22,000 claimants and a settlement of $22 million, constituting 0.18% of

17   the settlement amount);  <u>Alberto v. GMRI, Inc.</u>, 2008 WL 2561106, 11-13 (E.D. Cal. June 24, 2008)

18   (requiring the parties to present evidence showing the named plaintiff's substantial efforts taken as

19   class representative to justify the discrepancy between her $5,000 award, constituting 0.71% of the

20   settlement, and the $24.17 that each class member was expected to receive).  Here, only one named

21   Plaintiff is to receive an incentive award of $5,000, which is approximately 1.25 percent of the

22   settlement amount, while the estimated payout to Class Members is an average of $1,568.44.  While

23   this payment represents a higher percentage than other cases approving $5,000, Plaintiff argues

24   persuasively that the incentive award is justified.  She provided documents from her employment

25   that were instrumental in counsel's understanding of this case, provided contact information for

26   potential Class Members, contacted employees about this case, responded to telephone inquires from

27   counsel, responded to multiple requests for information, reviewed many documents produced by

28   Defendants, authenticated documents, and was a general source of valuable information which

**United States District Court**
For the Northern District of California

1   assisted the parties in reaching a settlement of this action.  See Hopson Decl. ¶ 4.  Thus, this

2   payment is not excessive under the circumstances of this case.

3           Fifth, the last Hanlon factor, the reaction of Class Members, is now known.  There were no

4   objections to the settlement from Class Members.  See Donly Decl. ¶ 18.  Accordingly, the Court

5   concludes that the Settlement Agreement is fair and grants the Joint Motion for Final Approval of

6   Class Action Settlement.

7   **4.      Plaintiff's Motion for Attorneys' Fees**

8           Counsel seeks $102,105.08 in fees, which counsel argues represents 25% of the Settlement

9   Amount, and $7,658.86 in costs, which represents approximately 2% of the Settlement Amount.  As

10  contemplated in the Settlement Agreement, there is no opposition to Plaintiff's Motion for

11  Attorneys' Fees.

12          There are two separate methods for determining attorneys' fees: (1) common fund doctrine;

13  and (2) lodestar calculation.  As stated in Hanlon:

14          In "common-fund" cases where the settlement or award creates a large fund for
            distribution to the class, the district court has discretion to use either a percentage or
15          lodestar method. Id. at 1295. The percentage method means that the court simply
            awards the attorneys a percentage of the fund sufficient to provide class counsel with
16          a reasonable fee. Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th
            Cir.1989). This circuit has established 25% of the common fund as a benchmark
17          award for attorney fees. Six (6) Mexican Workers v. Arizona Citrus Growers, 904
            F.2d 1301, 1311 (9th Cir.1990). . . .
18
            In employment, civil rights and other injunctive relief class actions, courts often use a
19          lodestar calculation because there is no way to gauge the net value of the settlement
            or any percentage thereof. The lodestar calculation begins with the multiplication of
20          the number of hours reasonably expended by a reasonable hourly rate. Blum v.
            Stenson, 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The hours
21          expended and the rate should be supported by adequate documentation and other
            evidence; thus, attorneys working on cases where a lodestar may be employed should
22          keep records and time sheets documenting their work and time spent. The resulting
            figure may be adjusted upward or downward to account for several factors including
23          the quality of the representation, the benefit obtained for the class, the complexity and
            novelty of the issues presented, and the risk of nonpayment. Kerr v. Screen Extras
24          Guild, Inc., 526 F.2d 67, 70 (9th Cir.1975).

25
26  Hanlon, 150 F.3d at 1029.  The common fund doctrine applies only if: "'(1) the class of beneficiaries

27  is sufficiently identifiable; (2) the benefits can be accurately traced; and (3) the fee can be shifted

28  with some exactitude to those benefitting.'"  Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268,

    271 (9th Cir. 1989) (quoting  In re Hill, 775 F.2d 1037, 1040 (9th Cir.1985)); see also Staton, 327

United States District Court
For the Northern District of California

1  F.3d at 973.  These criteria are met where "'each member of a certified class has an undisputed and

2  mathematically ascertainable claim to part of a lump-sum [settlement] recovered on his behalf.'"

3  Paul, Johnson, 886 F.2d at 271 (quoting Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct.

4  745, 749, 62 L.Ed.2d 676 (1980)); Staton, 327 F.3d at 973; see also, e.g., Blum v. Stenson, 465 U.S.

5  886, 900, n. 16 (1984) (noting that percentage of the fund is appropriate method to award attorney's

6  fees in common fund cases); Florida v. Dunne, 915 F.2d 542, 545 (9th Cir. 1990) ("Despite the

7  recent ground swell of support for mandating a percentage-of-the-fund approach in common fund

8  cases, however, we require only that fee awards in common fund cases be reasonable under the

9  circumstances.  Accordingly, either the lodestar or the percentage-of-the-fund approach "may,

10  depending upon the circumstances, have its place in determining what would be reasonable

11  compensation for creating a common fund.") (internal citation omitted).  The appropriate measure of

12  the fee amount is against the potential amount available to the class, not a lesser amount reflecting

13  the amount actually claimed by the members.  See Van Gemert, 444 U.S. at 477-82; Williams v.

14  MGM-Pathe Communications Co., 129 F.3d 1026, 1027 (9th Cir. 1997).  Here, the three Paul,

15  Johnson factors are met: (1) the Class is identified; (2) the benefits can be accurately traced because

16  they are monetary payments directly to Class Members; (3) and the fee can be shifted with

17  exactitude because counsel is claiming a specific percentage of the fund.

18         Although a benchmark of 25% of the common fund generally applies to awards of attorneys'

19  fees in common fund cases (Hanlon,150 F.3d  at 1029), the Ninth Circuit has also stated that "the

20  25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases.

21  Selection of the benchmark or any other rate must be supported by findings that take into account all

22  the circumstances of the case."  Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002);

23  see also Alberto v. GMRI, Inc., 2008 WL 2561106, 11-13 (E.D. Cal. June 24, 2008) (finding that

24  counsel had not provided sufficient information to justify an award of fees constituting 25% of the

25  expected recovery and determining that the percentage of the fund method to calculate fees was not

26  appropriate, instead looking to the lodestar method, requiring counsel to file a declaration

27  thoroughly explaining the fees).  Further, as stated above, the Ninth Circuit has also explained that

28  when parties negotiate a common fund settlement of a case brought under a fee-shifting statute, the

United States District Court
For the Northern District of California

1  value of the common fund will "ordinarily include an amount representing an estimated hypothetical

2  award of statutory fees." Staton, 327 F.3d at 972.

3          In this case, the 25% benchmark relied on by the parties did not take into account an

4  estimated hypothetical attorneys' fees award as contemplated by Staton.  Therefore, the amount of

5  attorneys' fees does not necessarily represent a true 25% of the common fund.  Under the alternative

6  lodestar approach, however, the amount of attorneys' fees sought is reasonable.  See Staton, 327

7  F.3d at 967.  As noted at the hearing, class counsel did not initially provide the Court with sufficient

8  information to determine the lodestar amount, because it did not set forth the billing rates expended

9  by each of the attorney who worked on the case.  After the March 10, 2009 hearing, however,

10  counsel provided a supplemental declaration attesting to the hourly rates of other timekeepers in this

11  case.  See Declaration of J.E.B. Pickett in Support of Joint Mot. for Final Approval of Class Action

12  Settlement at ¶ 3; Ex. A.  Specifically, Mr. Wynne spent 64.40 hours on this case at an hourly rate of

13  $675.00 for a lodestar calculation of $43,470.00.  Id. at Ex. A.  Mr. Pickett's hourly rate is $525.00

14  for a lodestar calculation of $53,445.00 and Ms. Phillips's hourly rate is $135.00[1] for a lodestar

15  calculation of $2,693.25.  Id.  The hourly rates and hours expended are reasonable, resulting in a

16  total lodestar of $99,608.25.  Id.  Therefore, only $2,496.83, or a multiplier of 1.02, separates the

17  lodestar amount from the amount sought under the common fund doctrine.  "In common fund cases .

18  . . the court can apply a risk multiplier when using the lodestar approach . . . . A 'multiplier' is a

19  number, such as 1.5 or 2, by which the base lodestar figure is multiplied in order to increase (or

20  decrease) the award of attorneys' fees on the basis of such factors as the risk involved and the length

21  of the proceedings."  Staton, 327 F.3d at 968.

22          This very modest multiplier is warranted.  Vizcaino, 290 F.3d at 1051, n. 6 (Appendix listing

23  range of multipliers, from 0.6-19.6 with most from 1.0-4.0 and a bare majority in the 1.5-3.0 range)

24  (citing In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions, 148 F.3d 283, 341 (3rd

25  Cir. 1998) ("'[M]ultiples ranging from one to four are frequently awarded in common fund cases

26

27          [1]          The declaration of J.E.B. Pickett appears to have a typographical error in paragraph 3,
   which lists Ms. Phillips hourly rate as $115.00.  According to the billing records attached as Exhibit A
28  to the Pickett declaration, Mr. Phillips's hourly rate is $135.00.  The Court relied on the billing records
   in calculating the lodestar.

1   when the lodestar method is applied.'" (quoting 3 Herbert B. Newberg and Alba Conte, <u>Newberg on</u>

2   <u>Class Actions</u>, § 14.03 at 14-5 (3d ed. 1992)).  This litigation has spanned almost two years in state

3   and federal courts.  The parties engaged in informal discovery and mediation.  Victory for the

4   Plaintiffs was not guaranteed, and they faced legal hurdles to prevailing.  All Class Members have

5   been given notice of the attorneys' fees in this case and none have objected.  <u>See</u> Nergaard Decl. Ex.

6   A (Notice of Settlement); Donly Decl. ¶ 18.

7          The cost award of $7,658.86 is also reasonable.  <u>See</u> <u>Vincent v. Brand</u>, 557 F.2d 759, 769

8   (9th Cir. 1977) ("The common fund doctrine provides that a private plaintiff, or his attorney, whose

9   efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to

10  recover from the fund the costs of his litigation, including attorneys' fees."); <u>In re Media Vision</u>

11  <u>Tech. Sec. Litig.</u>, 913 F. Supp. 1362, 1368 (N.D. Cal. 1996) (award of costs subject to

12  reasonableness test).  Here, the costs consist of the filing fee, Westlaw charges, Pacer charges,

13  courier charges, mediation costs, travel costs, class investigation costs, and transcript fees (<u>see</u>

14  Wynne Decl. ¶ 10), all of which are reasonable.

15  **Conclusion**

16         The Joint Motion for Final Approval of the Class Action Settlement is granted.  In addition,

17  In addition, Plaintiff's Motion for Attorneys' Fees is granted in the amount of $102,105.08 in fees

18  and $7,658.86 in costs.

19         The Court retains jurisdiction of all matters relating to the interpretation, administration,

20  implementation, effectuation and enforcement of this Order and the Settlement.  Upon completion of

21  administration of the Settlement, the Settlement Administrator will provide written certification of

22  such completion to the Court and counsel for the parties.  Pursuant to the Settlement, all

23  participating Class Members are permanently barred from prosecuting against Defendants, and their

24  parents, subsidiaries, affiliates, and trusts, and all of their employees, officers, agents, attorneys,

25  stockholders, fiduciaries, other service providers, successors, and assigns, and their parents,

26  subsidiaries, affiliates, and trusts, and all of their employees, any individual or class claims that were

27  released as set forth in the Settlement.

28  //

**United States District Court**
For the Northern District of California

//

       This action is hereby ordered dismissed with prejudice, each side to bear its own costs and attorneys' fees except as provided by the Settlement.

**IT IS SO ORDERED.**

Dated: April 3, 2009

_Elizabeth D. Laporte_
ELIZABETH D. LAPORTE
United States Magistrate Judge

**United States District Court**
For the Northern District of California